UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| ONE STOCKDUQ HOLDINGS, LLC,  )<br>  )<br>    Plaintiff,  )<br>  )<br>v.  )<br>  )<br>BECTON, DICKINSON AND COMPANY,  )<br>  )<br>    Defendant.  )<br>  ) | No. 2:12-cv-03037-JPM-tmp<br><br>JURY TRIAL DEMANDED |

<u>**ONE-SD'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**</u>

Pursuant to Local Patent Rule 4.4(b), plaintiff One StockDuq Holdings, LLC ("One-SD") hereby submits its Responsive Claim Construction Brief to the Opening Claim Construction Brief filed by Becton, Dickinson and Company ("BD").

**I.     INTRODUCTION**

BD either misunderstands the law of claim construction or purposefully ignores it.  In the instances where BD elects to offer support for its proposed claim constructions, it does so by disregarding the plain language of the claims and importing limitations not present in the claims directly from the preferred embodiments.  These tactics are proscribed by the most basic of claim construction principles.  As discussed in detail below and in One-SD's Opening Claim Construction Brief (DE # 72), the Court should reject BD's proposed constructions and adopt One-SD's proposed constructions.

**II.    CONSTRUCTION OF DISPUTED TERMS**

    **A.     BD refuses to construe the actual claims of the patent.**

As discussed in One-SD's Opening Brief, BD has not offered proposed constructions of the actual claims of U.S. Patent No. 5,704,914 ("the '914 patent"), but has concocted new terms

1

by replacing large amounts of pertinent claim language with ellipses. (*See* DE # 72 at pp. 15-16.) In its Opening Brief, BD attempts to justify this highly improper practice by stating that it would be easier to construe the terms it made up instead of the actual claims of the patent. (*See* DE # 73 at p. 7, n.3.) BD offers no support for the proposition that the claims of the patent may be re-written before they are construed, even if it would be "easier" than construing the claims as written. BD's argument should be rejected.

BD also contends that One-SD offered large blocks of information to avoid clear limitations of the claims. (*See id.*) In reality, One-SD only offered these large blocks of claim language to be construed in response to BD's refusal to construe the actual terms of the patent. Indeed, One-SD's Preliminary Identification of Claim Terms to be Construed proposed just four terms to be construed: "needle attachment body;" "flexible resilient diaphragm;" "fenestration;" and "central portion." See <u>Exhibit A</u>, One-SD's Preliminary Identification of Claim Terms to be Construed. After One-SD received the ellipses-filled terms manufactured by BD, One-SD proposed the complete claim terms to fill-in the language BD chose to omit from its identified "claim terms." In other words, the claim language offered by One-SD simply replaces the missing information from BD's imaginary claim terms. BD's contention that One-SD proposed this language for any other purpose is flatly untrue and improper. The Court should reject BD's arguments and construe the actual claims of the patent.

    **B.    BD's constructions of claim terms related to "flexible resilient diaphragm" are improper.**

        **1.    BD's construction of the term "flexible resilient diaphragm" should be rejected.**

The parties dispute the scope and meaning of the term "diaphragm" in the '914 patent. One-SD contends this term should be given its commonly understood meaning. BD, on the other

hand, ignores the claims, specification, and prosecution history and erroneously contends that a diaphragm can be any structure that prevents the flow of liquid.

### (a)   BD's construction of "diaphragm" disregards the language of the claims.

BD's construction of the term "diaphragm" ignores the plain language of the claim. The claim limitation at issue recites:

> … a flexible resilient diaphragm attached between said body and a proximal end of said hub proximal to said side access port for preventing the flow of a liquid through said hub lumen past said side access port and through the proximal end of said hub external to said introducer needle cannula.

(*See* DE # 72-3, '914 Pat. at 11:44-49.) Therefore, the claims require (1) a diaphragm that (2) prevents the flow of liquid. A "diaphragm" is a dividing membrane or thin partition. (*See* DE # 72-2, Webster's Third New International Dictionary, Unabridged, Definition of "diaphragm" (defining "diaphragm" as a dividing membrane or thin partition especially in a tube).) BD, however, proposes that the term "diaphragm" be construed to mean "a seal," because (according to BD) the diaphragm must inherently prevent the flow of liquid. Applying BD's construction to the claims produces a nonsensical result: the claims would require (1) a structure that prevents the flow of liquid that (2) prevents the flow of a liquid. BD's construction, therefore, improperly eviscerates the term "diaphragm" from the claim and should be rejected. *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (a party's claim interpretation largely reads the term "operatively" out of the phrase "operatively connected."); *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996) (the patentee's infringement argument "invites us to read [a] limitation out of the claim. This we cannot do."); *Rackman v. Microsoft Corp.*, 102 F. Supp. 2d 113, 121 (E.D.N.Y. 2000) ("To the extent plaintiff believes that 'insertable storage medium' should be

construed to mean 'any storage medium,' the Court rejects that view because it seeks to read the term 'insertable' out of the claim.").

### (b) BD's construction of "diaphragm" conflicts with the specification.

BD contends its construction of the term "diaphragm" is consistent with the specification of the '914 patent based upon the following two statements in the specification:

> (1) "A liquid sealing means, preferably in the form of a flexible, resilient diaphragm or septum 34 … encloses the proximal end of the hub 14 in a liquid tight manner." (DE # 72-3, '914 Pat. at 4:24-30); and

> (2) "A flexible, resilient diaphragm or septum 84 … forms a liquid sealing means." (DE # 72-3, '914 Pat. at 6:67-7:1.)

Each of these statements recites three different structures: (1) a liquid sealing means; (2) a flexible, resilient diaphragm; and (3) a septum. BD contends that these terms are interchangeable because there is no suggestion in the specification that these distinct terms have "any particular structure other than flexibility and resilience." (DE # 73 at p. 8.) BD's argument defies logic and completely ignores the basic fact that "liquid sealing means," "flexible, resilient diaphragm," and "septum" <u>are three entirely different terms</u>. There is no legal, factual, or logical support for BD's contention that the specification must do something other than use three separate terms, with three separate meanings, to convey three distinct concepts. To the contrary, it is incumbent upon BD to show that the specification explicitly redefines these three distinct terms to give them all the same meaning. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008) (citing *Phillips v. AWH Corporation*, 415 F.3d 1303, 1316 (Fed Cir. 2005) (*en banc*) ("A patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and customary meaning; however, a patentee must clearly express that intent in the written description.")). Here, the patentee expresses <u>no</u>

intent to act as its own lexicographer. The specification gives no special meaning to these terms. The specification simply states that the preferred embodiment includes a "liquid sealing means, preferably in the form of the a flexible resilient diaphragm or septum." The claims at issue, however, only recite one of these structures, "a flexible, resilient diaphragm." BD's attempt to collapse these three distinct terms from the specification into one, then import it into the claim, is contrary to law, fact, or logic, and should be rejected.

### (c) BD's construction of "diaphragm" conflicts with the prosecution history.

BD's construction completely disregards the prosecution history. The claims of the '914 patent, as originally filed, did not require a "flexible, resilient diaphragm," but a "liquid sealing means." The term "liquid sealing means" was replaced with "flexible resilient diaphragm" to narrow the claims to overcome prior art. *See, e.g.*, Exhibit B, February 21, 1997 Amendment and Response to Office Action at p. 11. BD's construction ignores this amendment and improperly attempts to broaden the claim to encompass precisely the language that was given up during examination of the patent. BD offers this construction with the sole aim of ensnaring prior art that was overcome during prosecution. This is improper. *See Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." (citing *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940); *Crawford v. Heysinger*, 123 U.S. 589, 602-04 (1887); *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227 (1880))).

BD's construction of the term "diaphragm" ignores the plain claim language, the specification, and the prosecution history and should not be adopted by the Court.

### 2. BD's arguments against One-SD's proposed construction of "flexible resilient diaphragm" are without merit.

One-SD contends that a "flexible resilient diaphragm" is "a pliable membrane, capable of returning to its shape after deformation, which is directly or indirectly attached to the hub partition the hub passageway." BD's arguments against this construction are without merit.

First, BD contends the word "membrane" is an "ambiguous, technical word." (DE # 73 at p. 9.) As an initial matter, the word "membrane" is not ambiguous. It is part of the commonly understood meaning of the term "diaphragm" from a common usage dictionary. (*See* DE # 72-2, Webster's Third New International Dictionary, Unabridged, Definition of "diaphragm" (defining "diaphragm" as a "dividing membrane or thin partition especially in a tube").)

Second, BD argues that, because the patent's specification uses the term "membrane" to reference another structure in the patent, that word cannot be used in the construction of the term "diaphragm." (*See* DE# 73 at p. 9.) BD offers no authority to support this odd proposition. A diaphragm is a specific type of "dividing membrane" or "thin partition" especially in a tube. The fact that the specification mentions a membrane in an unrelated part of the patent does not change the commonly understood meaning of the term "diaphragm."

Third, BD argues that One-SD's construction should be rejected because a "membrane" is not inherently liquid impermeable. One-SD agrees that a membrane is not inherently liquid impermeable. Likewise, a diaphragm is not inherently liquid impermeable. <u>This is precisely why the claims of the '914 patent include another limitation separately requiring that the diaphragm be liquid impermeable</u>.[1] As discussed above, BD's insistence that a "diaphragm" is

---

[1] The "claim terms" concocted by BD only serve to highlight this fact. BD asks the Court to construe "flexible, resilient diaphragm…for preventing the flow of a liquid." If a diaphragm was inherently liquid permeable, the language after the ellipses would be unnecessary.

inherently liquid impermeable would improperly eviscerate the term "diaphragm" from the claims entirely.

Fourth, BD contends that One-SD has "cherry-picked" the definition of "diaphragm" by omitting the words "thin partition" from the definition. This is untrue. One-SD's construction includes this portion of the definition and construes "flexible resilient diaphragm" to mean "a pliable membrane, capable of returning to its shape after deformation, which is directly or indirectly attached to the hub <u>to partition</u> the hub passageway." This construction clearly includes the "partitioning" aspect of the definition.[2]

Finally, BD's Opening Brief takes issue with One-SD's construction of the terms "flexible" and "resilient." (DE # 73 at p. 11.) BD asserts that the terms "flexible" and "resilient" should be given their plain meaning, yet fails to offer any construction of the plain meaning. Moreover, BD does not contend that One-SD's proposed constructions are incorrect. BD merely states that it would prefer that the Court not construe these terms, notwithstanding the fact that BD proposed these terms for construction. Because BD contends these terms should be given their plain meaning and does not offer that plain meaning or contest One-SD's plain meaning of these terms, the Court should adopt One SD's proposed constructions and find that "flexible" means "pliable" and "resilient" means "capable of returning to its shape after deformation."

### 3. BD's arguments concerning "attachment" of the diaphragm are unavailing.

#### (a) BD's construction of "between said body and a proximal end of said hub" should be rejected.

One-SD does not dispute that the commonly understood meaning of the word "between" is "[i]n or through the position or interval separating" as BD contends. (DE # 73 at p. 12.) The

---

[2] One-SD believes BD's argument is merely "splitting hairs." One-SD does not believe that defining a diaphragm as a "thin partition" instead of "a membrane that partitions" changes the scope of the claim and, therefore, does not object to the Court construing the term "diaphragm" in this manner.

dispute centers on which "position" or "interval" the diaphragm is "in" or "through." BD contends the diaphragm must be attached in a space between the hub and the needle attachment body. One-SD contends that the diaphragm must be attached to the hub to partition the hub passageway between the side access port and the needle attachment body. In other words, BD contends the diaphragm must be outside of the hub while One-SD contends that the diaphragm must partition the hub passageway at a location proximal to the side access port.

>  **(1)    BD's construction of "between said body and a proximal end of said hub" disregards the plain language of the claim.**

BD's construction of this limitation misrepresents the plain language of the claim. Specifically, BD's snippet of language from claim 22 merely requires a "diaphragm attached between said body and a proximal end of said hub." (DE # 73 at p. 11.) In reality, claim 22 recites a "diaphragm attached between said body and a proximal end of said hub <u>proximal to said side access port</u>." (*See* DE # 72-3, '914 Pat. at 11:44-46 (emphasis added).) The claim language "proximal to said side access port" cannot be ignored, but must be given meaning. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-52 (Fed. Cir. 2006) (rejecting a proposed claim construction because it would "read limitations [] out of the claim. Not only would that be contrary to the principle that claim language should not [be] treated as meaningless, but it would be contrary to the specification…"); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir.1994) ("All limitations in a claim must be considered meaningful."). BD, however, reads the language "proximal to said side access port" out of the claim term, thus depriving the term of its plain meaning.

The plain language of the claim requires the diaphragm to be attached between (a) the needle attachment body and (b) the <u>proximal end</u> of the hub <u>proximal to the side access port</u>. The proximal end is, by definition, proximal to the side access port because it is physically

impossible for the side access port to be located proximally to the end of the hub (and, therefore, outside of the device of which it is a part). Thus, the use of the term "proximal" to describe the end of the hub <u>and</u> to describe the location of the diaphragm in relation to the side access port, indicates the term "proximal end … proximal to said side access port" does not refer to the very end of the hub, but to the <u>portion</u> of the hub that is proximal to the side port. As such, the plain language of the claim requires the diaphragm to be located (using BD's definition of "between") "in or through the position or interval separating" the needle attachment body and the <u>portion</u> of the hub proximal to the side access port. (DE # 73 at p. 12.) Only by ignoring the relevant claim language "proximal to the side access port" (as BD attempts to do) can BD's proposed construction be justified.[3]

       **(2)    BD's construction of "between said body and a proximal end of said hub" ignores the specification.**

BD's construction also conflicts with the specification of the '914 patent. As discussed above, BD contends that the diaphragm of claim 22 must be attached between the end of the hub and the needle attachment body. The preferred embodiments of the '914 patent, however, all show the diaphragm <u>within</u> the needle attachment body and <u>within</u> the hub. Even BD's own representations of the preferred embodiments conflict with its construction, as shown in the figure from BD's Opening Brief reproduced below.

---

[3] BD's construction also conflicts with the plain meaning of the term "diaphragm". As discussed above, a diaphragm is a partition. BD's construction, which requires the diaphragm to be outside the hub, would effectively redefine and limit the term "diaphragm" to a "cap" or "cover."



(DE # 73 at p. 4.)  Indeed, BD's figure shows the diaphragm of the preferred embodiment (in green), clearly housed <u>within</u> the threaded portion of the hub (outlined in black), not within "a space that separates the needle attachment body and the hub" as required by BD's proposed construction.  Moreover, the figure shows that the needle attachment body of the preferred embodiment (in blue) extends far past the end of the hub placing the diaphragm of the preferred embodiment well within the needle attachment body, not within a space separating the hub and needle attachment body.

BD's construction is not only inconsistent with the drawings of the preferred embodiments (and its own renderings), but it is inconsistent with the specification itself, which states that the diaphragm may be "disposed within the hub" and that the purpose of the diaphragm "is to isolate the hollow interior of the body from the lumen of the hub." (DE # 72-3, '914 Pat. at 4:35-36 and 4:42-45.)  This is improper.  *See Rambus Inc. v. Rea*, 2013 U.S. App. LEXIS 19500, at *10 (Fed. Cir. Sept. 24, 2013) (quoting *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996)) ("A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'")).

BD's attempt to craft its own self-serving claim language and ignore the preferred embodiments of the patent should be rejected. Instead, the Court should adopt One-SD's proposed construction for this term, for the reasons set forth in its Opening Brief. (*See* DE # 72 at pp. 9-10.)

    **(b) BD's construction of "being attached to said hub to seal a proximal end of said hub lumen" should be rejected.**

BD once again ignores the plain language of the claim in construing the term "being attached to said hub to seal a proximal end of said hub lumen." BD proposes that the phrase "to seal a proximal end" be construed to mean "attached at the end." (*See* DE# 72 at p. 14.) Nothing in this claim term requires the diaphragm to be placed at a specific location. BD imports this limitation from the preferred embodiments, which show the diaphragm at the end of the hub. Importing a limitation into the claims of the patent is one of the "cardinal sins of patent law." *Phillips*, 415 F.3d at 1320. Therefore, the Court should reject BD's proposed construction of this term and adopt One-SD's construction, which, as discussed in One-SD's Opening Brief, naturally aligns with the plain claim language and the specification of the patent. (*See* DE # 72 at p. 10.)

    **(c) BD's construction of "to seal a proximal end of said hub lumen in a liquid tight manner" should be rejected.**

BD contends that One-SD's construction of this claim term is improper because the phrase "to seal a proximal end of said hub lumen in a liquid tight manner" does not contemplate liquid passing through the needle. (*See* DE # 73 at p. 15.) BD argues that One-SD's construction "effectively reads this phrase out of the claim by qualifying the concept of 'liquid tight' with an exception ('… except through the needle passageway …') not found in the claim." (*Id*.) This is incorrect. Claim 31 does, in fact, provide this very exception. The portion of the claim at issue recites: "to seal a proximal end of said hub lumen in a liquid tight manner for

preventing a liquid which has been introduced into said hub lumen from said catheter, <u>external to a needle which may be penetrating said diaphragm</u> …" (DE # 72-3, '914 Pat. at 12:16-20.) Therefore, One-SD is not reading limitations out of the claims. Instead, it is BD that is once again parsing the claim language to exclude portions of the claims. BD's attempts to do so should be rejected.

  **C.** **BD's constructions of claim terms related to "fenestrations" are improper.**

    **1.** **BD's construction of the term "on a central portion thereof" should be rejected.**

BD contends that "on a central portion thereof" should be construed to mean "closer to the center than to the ends of the needle." BD offers absolutely no support for this construction. Instead of providing any explanation why the Court should adopt its construction, BD merely attempts to attack One-SD's construction. BD's attack rings hollow because they actually <u>support</u> One-SD's position.

One-SD contends that "on a central portion thereof" should be given its commonly understood meaning, that is, "between the ends of the needle." As explained in its Opening Brief:

> The word "center" can either relate to the "center point" of an object or the "middle part in contrast to sides, boundaries, outskirts, circumference, or peripheral features." See id., Definition of "center". Here, the plain claim language requires the fenestrations to be located on a "central portion," not at a "center point." Therefore, a person of ordinary skill in the art would construe the phrase "central portion" in claims 22 and 31 to mean the "middle part in contrast to sides, boundaries, outskirts, circumference, or peripheral features," that is, the part of the needle between the ends of the needle. Nothing in the specification or prosecution history would lead one of ordinary skill in the art to give this phrase anything but this commonly understood meaning.

(DE # 72 at pp. 12-13.) Apparently, BD agrees. In its Opening Brief, BD provides nearly the identical argument:

> *Fourth*, even One-SD's own extrinsic evidence states that "central" is "relevant or pertinent to a center" and that "center" means the "middle part in contrast to sides, boundaries, outskirts, circumference, or peripheral features" or the "middle area." (Ex. B). Nothing in the specification suggests a departure from this common meaning.

(DE # 73 at p. 18.) It is clear from the statements above that the parties agree the term should be given its commonly understood meaning. It is also clear that the parties agree that the commonly understood meaning of "central portion" is the "middle part in contrast to the sides, boundaries, outskirts, circumference, or peripheral features." The only such "sides, boundaries, outskirts, circumference, or peripheral features" on the needle are the ends of the needle. Thus, the middle part of the needle in contrast to the "sides, boundaries, outskirts, circumference, or peripheral features" is the portion of the needle between the ends. This should resolve this dispute.

BD also argues that the specification of the '914 patent "uses the word 'central' to mean 'in the middle,' not anywhere along the needle's length." (DE # 73 at p. 17.) Specifically, BD states:

> According to the '914 patent, the catheter assembly is to have "[a]n elongate, cannulated catheter introducer needle 27, having a sharp beveled tip 28 at its distal end and at least one, but, preferably, a plurality of spaced apart fenestrations 30 formed along a central portion of its length." '914 patent, col. 3:67-4:4. If, as One-SD posits, "centrally located" means merely "between the ends of the needle," then there would be no need for the specification to use the word "central" in the above-quoted section—a plurality of spaced apart fenestrations "along…[the needle's] length" are necessarily "between the ends of the needle."

(*Id*.) This argument suffers from several fatal flaws. First, the language quoted from the specification by BD is discussing a preferred embodiment of the invention, not the invention as a whole. Second, the quoted language is referencing a preferred embodiment of the invention that

-13-

has fenestrations arranged around the center of the needle. This is why the specification refers to "central portion" in the context of the "length" of the needle. That language is necessary to describe the preferred embodiment, which has fenestrations arranged around the center point of the needle. The claims, however, do not require the fenestrations to be located on a central portion <u>of the length</u> of the needle, but merely on a central portion of the needle. This difference in language between the discussion of the preferred embodiment in the specification and the claims of the patent actually compels a different construction of the term as it is used in the claims. A "central portion thereof" is broader than a "central portion of the length," and should be treated that way for purposes of claim construction. Accordingly, the discussion of the preferred embodiment quoted by BD actually <u>supports</u> One-SD's construction of the term.

BD also argues that the fenestrations must be arranged on the needle in the manner described in the preferred embodiments because the fenestrations must align with the hub. (DE # 73 at p. 17-18.) This argument, too, fails for multiple reasons.

As an initial matter, BD claims without any explanation or support that the "flash back feature" of the claimed invention "would not work" if "the fenestrations were not in the center of the needle and therefore aligned with the hub when the needle was in the operative position." (*Id*.) This unsupported argument is without merit. Notwithstanding the fact that BD fails to provide any explanation why flashback would not occur, the claims do not recite a "flash back feature," and it is improper to read this requirement into the claims.

Moreover, this argument completely ignores the other claims of the patent. The Federal Circuit has held that "other claims of the patent in question, both asserted and unasserted can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314. For instance, "the presence of a dependent claim that adds a particular limitation gives

rise to a presumption that the limitation in question is not present in the independent claim." *Id*. at 1315.  This presumption arises here because claim 27 of the '914 patent, which depends from claim 22, adds the limitation "wherein said at least one fenestration is disposed within said hub lumen when said introducer needle is disposed in said operative position."  It should be presumed, therefore, that in the claims at issue, the fenestrations may be disposed anywhere distal to the flexible, resilient diaphragm when the needle is in the operative position.  BD cannot overcome this presumption simply by ignoring the fact that dependent claim 27 exists.

> 2. **BD's arguments regarding the communication of the fenestrations with the hub lumen are without merit.**

BD contends that in order to "communicate" with the hub lumen, the fenestrations of the needle must be aligned with the hub lumen, or the "flashback" feature will not function.  (DE # 73 at pp. 18-19.)   These arguments are addressed above.

BD also argues that statements made during prosecution of the '914 patent prevent a construction of "communication" that includes fenestrations that are not aligned with the hub when in the operative position.  (DE # 73 at pp. 19-20.)  As discussed above, this argument completely ignores the existence of claim 27, which raises a presumption that the fenestrations need not be aligned with the hub lumen.  In order to disclaim embodiments during prosecution, the patent holder's disavowal must be clear and unmistakable, and not "suitable to multiple interpretations."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1329-30 (Fed. Cir. 2003).  Thus, it is absurd for BD to argue that the patentee disclaimed this claim scope, given that dependent claim 27 was allowed to issue after the alleged "disclaimer."

    **D.**    **BD's constructions of the "other terms" at issue are improper.**

        **1.**    **BD's construction of the term "needle attachment body" should be rejected.**

            **(a)**    **BD's construction of "needle attachment body" disregards the claim language.**

It is clear from the proposed constructions, that the parties agree the claims of the '914 patent should be construed such that the "needle attachment body" houses the needle. Furthermore, both parties agree that the "needle attachment body" should shield the tip of the needle. Based upon its improper importation of the preferred embodiment into the claims, however, BD contends that the needle attachment body must house the entire needle. BD's construction should be rejected.

BD's sole support for its construction comes from its citation to the description of the preferred embodiment in the specification of the '914 patent. (*See* DE # 73 at pp. 24-25.) This is improper. *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). BD, however, goes one step further and actually attempts to use an inventor's statements about the preferred embodiments as evidence for its faulty construction. (*See* DE # 73 at pp. 25 (citing Dr. Stocking comments on what the patent "pictures").) Even if this type of extrinsic evidence was relevant in claim construction,[4] those "statements" are actually questions about a potential commercial embodiments of a device, not the patent claims. (*See* DE # 73-4.) As it does throughout its Opening Brief, BD once again ignores basic claim construction principles in an attempt to improperly limit the claims to the preferred embodiment.

---

[4] In *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008), the Federal Circuit held that an inventor's testimony regarding his or her subjective understanding of patent terminology is irrelevant to claim construction. *See also Medisim Ltd. v. BestMed LLC*, 2013 U.S. Dist. LEXIS 70811, at *76-77 (S.D.N.Y. May 15, 2013).

The specification makes it clear that the purpose of the needle attachment body is to prevent needle sticks. (*See* DE # 72-3, '914 Pat. at 8:23-26 ("[A] hollow sheath forming a needle attachment body is also provided wherein the needle can be safely housed following use to protect those handling the assembly from an accidental needle stick.").) It should go without saying that the part of the needle capable of sticking a clinician is the tip, and the patent provides preferred embodiments to show several exemplary needle attachment bodies that protect the sharp tip of the needle. Those designs includes a needle attachment body that incorporates a retraction mechanism. As can be seen in Figure 8 of the '914 patent (reproduced below), the preferred retraction mechanism is incorporated into the needle attachment body, which by virtue of the design of the retraction mechanism, entirely houses the needle.



FIG. 8

The claims at issue here do not require that the "needle attachment body" incorporate a retraction mechanism, especially not the specific preferred mechanism described in the specification. Nowhere in the claims or specification of the '914 patent does it state any benefit to protecting the entire needle. It is improper to take tangential elements of the preferred embodiments that are unrelated to any of the claim language or purposes of the element at issue and import them into the claims. Thus, BD's proposed construction of the term "needle attachment body" should be rejected.

### (b) BD's argument regarding the explicit use of the word "attachment" is a red herring.

BD contends that One-SD's proposed construction ignores the word "attachment" in the term "needle attachment body." (DE # 73 at p. 21.) This is a red herring. As BD's own brief points out, the claims include a separate limitation that requires the needle to be attached to the body. (*See id*. at p. 21 (noting that both claims 22 and 31 require "a cannulated catheter introducer needle having a sharp tip on a free end thereof and having an opposite end <u>attached</u> to said needle attachment body …") (emphasis added).) Therefore, even if One-SD's use of the word "housing" alone does not implicitly contemplate attachment, a separate limitation of the claim requires that the needle be attached to the needle attachment body and, as such, has no effect on the scope of the claim at issue.

### 2. BD's construction of the term "connected to said hub" should be rejected.

BD offers no rationale for its construction of the term "connected to said hub." Instead, BD again resorts to attacking One-SD's construction. Specifically, BD takes issue with One-SD's use of the word "linked" in its construction. (DE # 77 at p. 22.) BD demands that One-SD provide some extra justification for why it included the term "linked" in its construction. This is puzzling because One-SD contends that the term "connected" should be given its commonly understood meaning, and "joined or linked" is the commonly understood meaning. (*See* DE # 72-4, Webster's Third New International Dictionary, Unabridged, Definition of "connected" (defining a "connected" as "joined or linked together").) In common usage, "connected" is a broader term than "joined." Two things may be "connected" by being directly "joined" to one another, or indirectly "linked" through something else. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) ("The ordinary meaning of 'connected to' encompasses indirect linkages."). Thus, it is BD, not One-SD, that departs from this commonly

-18-

understood meaning. Because BD provides no basis for ignoring the plain meaning of the claim term "connected," this Court should reject BD's effort to limit the phrase "connected to said hub" to mean "joined to the catheter hub." Instead, the Court should adopt One-SD's proposed construction, which gives the term "connected" its commonly understood meaning: "joined or linked together."

      **3. BD's construction of the term "a liquid which has been introduced into said hub lumen from said catheter, external to a needle which may be penetrating said diaphragm and projecting into said hub lumen" should be rejected.**

As BD states in its Opening Brief, the parties do not disagree significantly on the construction of this phrase. (*See* DE# 73 at p. 23.) BD takes issue with One-SD's request that the Court give the term "lumen" its commonly understood meaning within this phrase, that is, "passageway." (*See* DE # 72-4, Webster's Third New International Dictionary, Unabridged, Definition of "lumen" (defining a "lumen" as a cavity or passageway).) BD does not offer a competing construction for this term nor does it disagree that a "lumen" is a passageway. BD merely argues that the term "lumen" should not be construed because the commonly understood meaning of the term is the same as another term in the patent. BD offers no legal basis for the proposition that terms should not be given their ordinary and customary meaning if that meaning is the same as another term in the patent. With no competing construction offered by BD, the Court should reject BD's arguments and adopt One-SD's construction of this claim term.

### III. CONCLUSION

For the foregoing reasons and the reasons stated in One-SD's Opening Claim Construction Brief (DE # 72), this Court should rejected BD's proposed constructions of the disputed terms and adopt One-SD's constructions as proposed in Docket Entry No. 72-5.

Dated:  October 14, 2013

s/ William C. Ferrell Jr.
Joel T. Beres (Kentucky Bar # 84376)
James R. Michels (Tennessee Bar # 21604)
William C. Ferrell, Jr. (Tennessee Bar # 27220)
Melissa Hunter Smith (Tennessee Bar # 26387)
Kevin P. Hartley (Tennessee Bar # 29199)
STITES & HARBISON, PLLC
401 Commerce Street, Suite 800
Nashville, TN 37219-2376
Telephone:  (615) 782-2328
Facsimile:  (615) 782-2371

Counsel for Plaintiff,
*One StockDuq Holdings, LLC*

### CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2013, a copy of the foregoing was filed upon the following counsel of record via the Court's electronic filing system.

s/ William C. Ferrell Jr.
Counsel for Plaintiff